Thank you, your honor. My name is Mark Haddad of Sidley, Austin. I represent Dr. Harkonen. Dr. Harkonen was convicted of wire fraud for issuing a press release announcing data, quote, demonstrating a survival benefit of Actimmune in IPF and saying, quote, Actimmune reduces mortality by 70 percent in patients with mild to moderate disease. The government argued at trial that these statements were false, chiefly because the trial did not generate statistically significant P values on pre-specified endpoints, and also argued that the press release omitted certain details, such as that the mild to moderate subgroup was not pre-specified in the trial plan. We submit that the government's case and its evidence is not sufficient to support the evidence. This theory of falsity depends on a particular view of when evidence, quote, unquote, demonstrates an effect, a view on which reasonable scientists at a minimum disagree. Specifically, it depends on the view that clinical trials cannot demonstrate anything unless they produce statistically significant P values. And while some informed scientists may fervently believe that, many other informed scientists fervently do not. And that disagreement matters because the United States Supreme Court established virtually a hundred years ago that where informed and intelligent minds disagree about whether a particular treatment has a particular effect and where there's no precise standard to decide which side is  has a particular effect or not. And that's what we're trying to do here. In the McAnulty case, Your Honor. Well, has McAnulty ever been applied in a criminal fraud case? It was, Your Honor, in United States v. Bruce by the Eighth Circuit. And what was the outcome there? The court reversed the criminal conviction, Your Honor, for failure to give a requested McAnulty instruction, and therefore to satisfy McAnulty. And it's also been applied in civil cases, and where the court has applied it in civil cases, for example, in Riley v. Pincus, the United States Supreme Court, revisited McAnulty, called it a wholesome limitation on the breadth of the wire and mail fraud statutes, and said... And did you cite Bruce? I'm sorry, in your briefs, did you? We did. In both our opening and reply, it was the government that did not cite Bruce. Okay. And the reason that it's important is this, that the government has long ago given up trying to prosecute and define what scientific beliefs are true and which are false under the wire fraud statute. The wire fraud statute wasn't intended to reach that far. The Supreme Court made that clear. It reiterated that twice. And, you know, the federal agencies have gone on to regulate what companies can say or not say about their data. Here's the problem I have with your argument. You know, I think it basically, it's a sound one. It's supported by the cases, but obviously, you know, there's some line between what might be called a legitimate scientific debate and, you know, one that's not, in the sense that, you know, you could say it's not scientific, but say in the medical area. You know, I mean, criminal defense has been pursued for what we would call quackery, right? I mean, that, you know, and you can say there's a medical disagreement there, but in other words, there is a scientific disagreement. And I guess my question is, how do we define where that line is, you know, where that, to make, I know this record supports, there are individual views on both sides. But the question is, at what point does it become, you know, sufficiently, I'll say sufficiently legitimate so it takes it, you know, into the McAnulty area? Well, it's an important question, Your Honor, and the Supreme Court's wrestled with it in, certainly in the Riley case, where I think it's clear that if someone just has, you know, a very marginal dispute, and when you read the facts of that case, you'll see how marginal it was. That's not enough. But here... In your analysis, isn't this case about the advertisement, intermune analysis, phase 3 data demonstrating survival benefit of active immune in IPF reduces mortality by 70% in patients with mild to moderate disease. Isn't the government saying those are fraudulent statements? The government is, but to find them fraudulent, Your Honor, in this press release and not advertisement, you have to accept the premise that the government built its case on, which is that it was the absence of statistically significant P values in the study that prevented drawing those conclusions. And it's clear, both from the evidence in the trial record and from the government's submission in its matrix Supreme Court brief to the United States Supreme Court, that there is a legitimate, valid, widespread debate over whether you need statistically significant P values in order to draw conclusions from study data. And I urge the court to read the government's matrix brief at pages 13 to 15 in particular and to read footnote 2, which is on page 15 and where the United States said to the Supreme Court that a study in which the cure rate for cancer patients who took a drug was twice the cure rate for those who took a placebo could generate meaningful interest even if the results were not statistically significant. Now that's the exact opposite of what the jury. And the opposite view is one view that one can have, but the view that the United States gave the Supreme Court in matrix is certainly another and fully supported. And it's supported not only by the evidence in the full record of this case, the evidence given to the district court before trial in the declaration of Dr. Hannon, the further supporting evidence given at sentencing, but it came out in the trial itself. What's the standard of review here on the First Amendment issue? How much deference are we supposed to give to the jury? On the First Amendment issue, Your Honor, the court initially gives deference to the jury, but on the key constitutional facts, which here would be whether the statements are false and whether Dr. Harkinen issued those statements in good faith, those are the things that the court then reviews the evidence de novo. And that's clear, for example, in the McCoy versus Stewart case, which is a gang activity case, and where it was critical to decide whether the defendant was urging gang members on to conduct unlawful acts. And the court reviewed the testimony about what that gang member said de novo in reaching its judgment. And that was even on habeas, on EDPA review. So the court has at least that much freedom here. My understanding of McNulty, because that is an older case, that resulted in saying that statements are fraudulent only if absolutely false. It seems like that rests on an outdated kind of narrow definition of fraud. It appears that the Supreme Court and the Ninth Circuit have indicated that any statement, since then, have indicated any statement might be fraudulent if in context is dishonest or misleading, and it need not be absolutely false. I would disagree, Your Honor, and I would ask the court first to look at the Ninth Circuit's own judgment in Fanning versus the United States. There, there was no dispute. The court applied McNulty, but it said that the statements there, which were a kind of quackery, they were advertisements that guaranteed the safety of the treatment for everybody, so it was a sort of a guaranteed safety claim. They said it was clear from the trial that if you took this supplement, it was as dangerous as swallowing sulfuric acid. So it was absolutely clear that it was quackery. Now here we have witnesses that the government itself sponsored explaining that it was their view that there were two sides to this debate, that it was an academic debate, that the interpretation of this data lay in a gray area. Those are the words of Dr. Hockmeyer, who was a research scientist with the Army for 15 years. When I go back to the falseness or suspected falseness of the statement by Mr. Harkonnen, he refused to show these, he took subgroup after subgroup after subgroup until he got a result that he liked. He would not show it to his associates. He would not listen to the advice that he was given by his own people about the wisdom of advertising as he did. Aren't we concerned with his intent to mislead the public? Two points on that, Your Honor. First, intent is separate from falsity, and the court has to look at the evidence on each independently. Falsity has to be decided independent of intent. I'll put intent to falsify the information. Right, and intent to falsify is also reviewed de novo after giving deference to the jury, but then the facts are reviewed de novo by this court to see if they clearly, convincingly support what the jury did, and the description that Your Honor just gave in capsule form, Your Honor will find is not supported by the record, that in fact, the company's biostatistician did the first subgroup analysis. That produced a result entirely consistent with the one reported in the press release. In fact, in some respects, it produced a higher percentage of survival, 74% rather than the 70%. All of the subgroup analysis was reinforcing, and as the literature shows, subgroup analysis is routinely done when you get an important result, and the result here was that 40% more of the patients who got the drug survived than those who got the placebo. That is a powerful, powerful finding. It produced a p-value that, while not meeting the arbitrary .05, was .08. Now, some statisticians will say you always have to get .05, but other statisticians will say, no, you look at the context, .08 can be a meaningful p-value when you look at the context, prior studies, what we know about the disease, what we know about the mechanism of treatment, and all of that was in the press release as well. There was a prior study with which this survival result was completely consistent. And so, those are the very factors that the government points to in Matrix to explain why statistical significance is what they call a dramatically under-inclusive criteria for evaluating the truth of statements. Now, under the Due Process Clause, there's absolutely no notice that when a company issues a press release, it has to hew to the views of FDA or individual officials. And so, just on the fundamental due process cases, I would urge the court to look at a case like Farinella, where the Seventh Circuit found that what an individual FDA employee says is not determinative of what does not draw a clear line for the public to separate lawful from unlawful conduct, and that then goes to intent. I wanted to also talk about materiality for a moment, because that's a separate reason to reverse, and incredibly important here as well. The government did not even argue the element of materiality in closing argument. They did not even mention that element of the offense. And there's a reason. There is no evidence in this record that the alleged false statements or omissions were material to doctors. When you say material, I mean, you have to consider what, the intended audience or the probable audience of the release? Is that what you're getting at? Yes, because the only way for a patient to get this medicine is if a doctor prescribed it, and a doctor is a learned intermediary. So the question is, would the challenged statements within this press release be material to a doctor's prescribing decision? And this is exactly analogous to the Goyal case, where this court reversed for lack of evidence on materiality. And you rely on that VA study, no? Well, yes, that further supports the lack of materiality. If the court looks at, I believe, page VA006, you'll see that the VA itself was authorizing the prescription of this drug for substantive scientific reasons. And the idea that a press release would influence the decision making is completely destroyed by that evidence, evidence that should have been given to the defense before the trial. So, just as in Goyal, even if where, you know, the accounting treatment was material to all the sales, but never shown to be material to the sales in question, here. Well, the GIPF001 results were published in an article in the New England Journal of Medicine. That's correct, Your Honor. And that article concluded that, quote, our study, design, and data do not allow us to draw inferences from these analysis of the survival trend. So here, we have a peer-reviewed scientific journal, it appears, indicated nothing can be said definitively about survival data of this particular study. Is that pretty powerful evidence that the definitive statements in the press release were, in fact, misleading? No, Your Honor. To the contrary. The same journal article also says that a survival effect cannot be ruled out. That is one of the two conclusions at the outset of the journal article. And I urge the Court on this particular point to look at the declaration of Dr. Stephen Goodman, who talks about how important this is. Because this shows that even the journal article, and the editors who are very conservative, felt it important to tell the public that one inference that one could draw is a survival effect. A letter to the editor was then published complaining that the journal article was too conservative. And the study authors themselves published a subsequent article in the peer-reviewed magazine, Chest, explaining why the primary endpoint was probably defined too narrowly, and that's why they didn't get a higher p-value. So this is very much the subject of medical debate, and the First Amendment implications of stifling and setting p-value-based rules for what can be said about study data would be unprecedented and have a highly chilling effect. Before you sit down, just the Bruce, I wanted to make sure, I wanted to look it up. It says that's the case that's from 1912, is that right? Correct, Your Honor. And the plaintiff there asked for a McNulty instruction and did not get it, so the Eighth Circuit reversed. But the case didn't really hold that the prosecution was precluded altogether, did it? That's correct, Your Honor, but you still have to have evidence to satisfy McNulty. And McNulty was, our argument here is you have to look to see if the evidence supports McNulty and where you have the kind of disputes between Dr. Pennington, who consistently said the evidence demonstrated a benefit, Dr. Porter, who said the odds, in his view, were 65% that it demonstrated a benefit, and who signed the final report to FDA years after Dr. Harkinen left saying it demonstrated a benefit. Did you want to reserve? The conflict is clear. I do want to reserve your time. Okay, your minute and a half, okay.  May I please the court? My name is Ann Voights and I represent the government in this case. The First Amendment does not bar defendant's conviction for having made knowingly false statements about the existence of a causal connection based on statistical data that did not reach significance. What is your case for that? I mean, this is a criminal prosecution. Is the government entitled to criminally prosecute anyone who issues a press release that describes the result of a post hoc statistical analysis? If it does so in a way that is false and fraudulent, yes, and that is what the evidence here consistently showed was that based on the testimony of Dr. Fleming, based on the testimony of Dr. Krager and Dr. Walton as well, was that you could not draw a clear causal connection here based on the stated evidence. But there was testimony on the other side. There was not. In fact, your Honor, the testimony to which the defendant refers was in fact declarations that were submitted not in conjunction with the trial itself, but with sentencing. I do want to ask him, do you know why that was not presented at the trial? I don't know. They did notice experts to address all of these areas, but they in the end chose not to put any of them on. What about Dr. Raghu? Dr. Raghu did testify. And when he testified, he spoke about getting the information from defendant when he was called. And his quote, he never saw the entire press release. He was asked to confirm his quote, which he did. But again, he never, when you look at the evidence, as Dr. Fleming said, as Dr. Krager said, you could not draw a causal conclusion based on this evidence. And they found that for multiple reasons, all of which were established in their testimony. Well, Dr. Raghu did agree that the subgroup analysis was compelling and important. Isn't that significant evidence? No, I don't think so, because everyone agreed that it was important to do post hoc analyses, to look to see if there was some way essentially to suggest avenues for future research. That's what the testimony consistently established, but not that you could use these post hoc analyses, which were done not just one time, but multiple times in order to try and come up with the best possible looking result to establish a causal connection. And that was for a number of reasons, because this study itself had missed not just its primary endpoint, but all of the secondary endpoints as well, because it didn't take into account the multiplicity problem. That is, when you look for more, when you have a number of different metrics, your likelihood of finding a result that is in fact due to chance rises. And then the fact that the study was internally contradictory, and again there was testimony from more than one witness on this point, that if you really expected to see this causal connection, the way they thought the drug worked was by improving lung function. That's what the principal endpoint was designed to measure. But in fact it didn't show a statistically significant result for that. It didn't even come close to showing a statistically significant result for that. So there was tension between the results that suggested, as Dr. Walton told defendant and the other people at Intermune, that this was in fact anomalous, that it looked like even with the subgroup analysis, that this was the result of chance, that it was particularly unreliable for this reason. Now as far as the, I'll call it the constitutional defense's concern, the First Amendment claim, you agree with Mr. Haddad as to what facts we should in effect review de novo? I do not. As this Court has held, even if Bose were to apply, in doing so this Court defers to the jury's resolution of any conflicts in the evidence, credibility determinations, and even the elements of statutory liability. And then if there's substantial evidence supporting the verdict as there in fact is here, the Court can consider again whether this meets the standard for a constitutional fact, but we would submit that that is amply met here, particularly when this Court looks at the record at trial. You say we look at the jury verdict first. Is that what you said? Yes. If you look at the, if you can take the jury's verdict under this Court's law, we defer to the jury's resolution of conflicts in the evidence, to their resolution of credibility issues, and to their determination on the elements of statutory liability. What is the, from your view, what is or what are the constitutional facts at issue here? I think at most it's whether this is, whether there were provably false or fraudulent statements. What about on the question of the defendant's intent? I think that reaches an area that this Court and other courts haven't been particularly clear about, whether that constitutes an element of the offense. Typically elements of the offense aren't reviewed that way, and there are certainly cases saying that they don't review scienter under the Bose standard, but even if this Court were to apply the Bose standard, we'd submit that on this record, you should affirm defendant's conviction. All right. Now, assuming we give credence to the government's position in the Matrix case, should that have any impact at all on our, on our decision? No, it should not, because Matrix is entirely consistent with the government's theory here. What Matrix holds, quite simply, is that you can't, that statistical significance is not the sole measure of whether something was relevant for purposes of information of an investor, whether they would consider it or not. But in this case, what they said was they said that there was a statistically, they, they weren't going beyond statistical significance to say that there was something else that supported a causal connection. They said that the data in this test, and I'm quoting from the press release, demonstrated a significant survival benefit. That it, and I quote, had a statistically significant survival benefit in patients with mild to moderate IPF. So this is not a case where they were saying, we believe that there's causation based on external evidence. They're saying, this evidence itself is statistically significant. And for all the reasons set forth when, in Dr. Fleming's testimony, in Dr. Prager's testimony, and in the testimony of the other witnesses, that simply was not the case. In fact, when defense posits this as something where there are two sides to the debate, it's worth looking again at the testimony of the witnesses. Dr. Fleming, in his letter that he wrote after he saw the press release, said he'd seen nothing like this in 100 clinical tests in present, in the way that these results were presented. Again, Dr. Walton expressed his disappointment with the press release. And if you look, as a district court did, if you look even at defendant's own actions. Those are also evidence that he knew that these statements were false, and that he was acting with the intent to defraud the, what I believe Judge Nielsen called the sort of systematic effort to exclude everyone from the process of review. Who had had access to the data, and who would understand and be able to challenge the statements that were being made. And the record, again, is undisputed on this point, that you had, you had Dr. Crager who wanted to participate in reviewing it. You had Dr. Porter, you had Armstrong, who also, she was waiting around, she was asking to try and review it. And they weren't able to. And you had Weiss' testimony. He also said that he had asked defendant, he wanted to talk to clinical people, he wanted to see the raw data. It was really important to get this right, and he didn't get it. There was time for people from sales and marketing to review the press release. There was time for people from investor relations, there was time for the general counsel to review it. But not for the clinical and regulatory people, even though they had expressed their concerns, saying that they wanted to review the data. And even though Weiss had also said that he wanted them to be able to review it. Instead, when they tried to, defendant asked Weiss to leave the room and got upset at him, as set forth in Corey's testimony. What is your response to Mr. Haddad's argument that there was, I think he said something like this, no evidence on the materiality element? I believe he said that there was no argument, or no closing argument on materiality. Well, we would submit that there was, in fact, considerable evidence of this. And we'd point the court first to Exhibit 96, which was a voice recording from a sales representative calling to say that he had talked to a doctor who'd been on the fence about prescribing Actimmune. But he'd read this press release, and now he was going to prescribe it. You can also look more generally, and that's going beyond even what the government has to prove. The government doesn't have to prove actual reliance, just a tendency, reasonable tendency to influence to be taken into account in the decision making process. Moreover, this wasn't, as defense submitted, targeted solely to doctors. This was also, by defendant's own intention, intended to go to patients as well, and also to their families. That was part of, in the wise email to defendant, when they were defining who the audience was. It was not solely to doctors. It was intended to go to patients. And in fact, the testimony established that the defendant here asked that the press release end up being distributed to the patients as well. Because it's not simply a one way street. Doctors can prescribe something, but patients can also ask for things. They can make decisions for themselves about whether the side effects are worth going on with a drug. And that may be influenced by statistical data about whether the drug is, in fact, effective or not. And the VA study or practice, can you talk about that? Certainly. So with respect to the Brady point, what the district court did, and the district court who sat through the quite lengthy trial here, looked at these sort of four categories of documents and concluded that there was no problem with this. That they had very little, if any, and I'm quoting from her order, very little, if any, exculpatory value for defendant. And taken cumulatively, that they failed to cast any serious doubt as to materiality. She did so because, if you look at sort of, if I could unpack this and look at the four categories quickly. First, there were letters explaining the relevant clinical data at the time didn't support prescribing Actamine for IPF. But two of those predated the press release. The third letter actually did mention the press release. And it appeared that the patient or one of his family members had actually quoted something from the press release or relied on the press release in asking the VA to prescribe it. So that doesn't help defendant. That actually hurts his argument that materiality wasn't shown. And with respect to the prescriptions, a number of the other documents, in fact, significantly post-stated the press release. It wasn't your theory in the trial court that there was any intent or attempt by this press release to influence the stock market. No, it was- Because that's what kind of case Matrix was. Correct. Matrix wasn't trying to influence the scientific community. Correct. And here, the evidence is clear. It was intended not just for doctors. It was also intended to go to patients and to their family members and to influence those decisions as well. Well, that goes to the cross appeal. Because I know the government wanted a vulnerable victim award. But there didn't appear to be any evidence of any specific person who had lost hope or spent money or been harmed. You just mentioned a letter of a patient. Was that introduced at the trial? That was actually the letter from the VA in which they mentioned the fact that a patient, it's unclear whether it's a patient or his family member, had mentioned the press release in requesting Actimmune to be prescribed for IPF. And that was introduced? That was part of the VA documents. It was before the court. Thank you. So if I could address quickly one issue with the sentencing declarations on which defendant relies. Defendant had the opportunity to put experts on and to put it on witnesses who would establish that there was a scientific debate. The declarations that he put in were only put in in sentencing after the jury had considered all the evidence before it. After the district court had decided the motions for a new trial and the motions for acquittal. We'd submit that that is not evidence that this court should consider. Defendant shouldn't be given essentially a second bite at the apple after tactical choices that he's made simply don't work out. If I could address, also defendant mentioned in passing the due process issue. And I'd just like to note that the district court when she considered the challenge said that there were no vagueness concerns in this case. And said that to conclude that defendant was not on notice. That if he lied in a press release about the efficacy of a clinical trial, that that was simply an implausible contention. If I might, if the court has further questions on the main body of the appeal, I'm happy to address them. Otherwise, if I might, I'd like to take a minute or two to address the issues raised on the cross appeal, if I might. Please proceed. Thank you. There are two issues on the cross appeal, and both of them relate to legal errors made by the district court in calculating defendant's guidelines range. First, in failing to calculate intended loss. And second, in erroneously interpreting the term victim in applying the vulnerable victim enhancement to assume that you have to have a finding of actual loss. And that's not consistent either with the language of the guideline or with subsequent cases interpreting it. If I might address briefly the issue of loss first. With respect to intended loss, the court simply didn't make a finding. It didn't address it. And that was error under the guidelines. Under the guidelines, the district court must calculate, must determine which is greater, actual loss or intended loss. And the district court did not here, despite the evidence of defendant's intent to defraud. And in this case, you had defendant's own statements projecting in the press release itself what he thought the results would be. Well, didn't the district court make that finding regarding loss or sufficient enough of a finding regarding the loss when she said, I mean, she was obviously very well aware of your argument on that based on the record. She referred to the briefs on intended loss at the second hearing. In fact, you had a second hearing so you could satisfy her with respect to the loss. And I think the district court discussed the PSR, which contained arguments about intended loss with Mr. Harkin at the second hearing. Harkin's counsel mentioned both actual and intended loss at the second hearing. And then she made a statement at that time, I think it was at the second hearing, which says, when it comes to the loss, the case is really wanting and the kind of showing that would meet the preponderance standard. Why wouldn't that qualify as a rejection of the government's presentation regarding actual and intended loss? Because all of the court's arguments focused on whether an actual loss was feasible, not on defendant's intent. When they were discussing that, although it was raised in both of the government's sentencing submissions, and although it was raised at the first hearing and discussed, when you look at what she said, she said that there is no loss. It's a factual statement. Well, she said, I wanted something. She says, I think this is at ER 1796, I wanted something, a methodology that made sense. But that the government had failed to provide that on either its actual or intended loss. I think in your brief, you go on to say that in the alternative that it's always entitled to an enhancement in fraud. Because the district court must itself find a particular amount of loss. I don't understand that argument, but maybe you could speak to that. Sure, so when the district court said that there wasn't enough evidence in the record to satisfy the court that there is a loss as a result of the press release. The court, we think, in order to determine loss, the court does have to look at whether there is actual loss and whether there's intended loss. It has to make that calculation in order to apply the guideline correctly. And here, the court just didn't do that. It didn't make a determination of what it believed the intended loss to be. And we'd submit that on the evidence that was in front of it about defendant's hopes for, about his intentions for sales projections, that there was sufficient evidence to establish that he certainly did intend a loss to occur. And as this court found in Tulaner, it's intended loss is about what defendant intended to have happen. It's not about what actually could happen or what actually did happen. If I might also address, as I see it running short on time, the vulnerable victim issue. Sure. Quickly. With respect to that, again, here, the court committed a legal error because it imported the definition of a victim from 2B1.1 into 3A1.1. It found that because there wasn't an actual loss, that therefore there couldn't be vulnerable victims. But the victims in this case were people who were suffering from an incurable fatal disease as to which there was no known effective cure at the time. And who were told through this press release that there was a causal connection, to quote, if I might, the subtitle of the press release. That this reduced mortality by 70% in patients with mild to moderate disease. That fits squarely within one of the examples given in the vulnerable victim definition. That when a fraud case of marketing an ineffective cancer cure to someone who's suffering from the disease. We'd submit that this is a classic case where a vulnerable victim enhancement was appropriate. And that the district court committed legal error when it inappropriately imported the definition of victim from 2B1.1 into 3A1.1. Judge Patel had concluded that there was no victim at all, right? Correct. Something like that? And now what are you saying, under the proper definition, you don't need to have an actual victim? That's correct, and that's consistent with the case law from other circuits as well that have held, for example, in sting cases where the crime couldn't actually be completed, you could still apply the vulnerable victim enhancement based on who the defendant was intending to target. And here, it was undisputed, everyone knew that IPF was a fatal disease and that the people who had it had very little time to live and that there were no effective cures known at the time. Thank you. Thank you very much. Counsel, I did find it quite curious that you didn't put on any experts during the trial and didn't make any motions after trial regarding experts and you waited until sentencing to put on experts regarding basically your theory. What was the reason for that? Trial counsel explained to the jury that they didn't need to put them on because the evidence to rebut the government's case came in through the witnesses that were called at trial. They were all recipient witnesses, and counsel has only talked about the ones that support the government's side of the case. I understand, but you had a whole, you had some number at sentencing and a lot of information at sentencing that you were putting before the district court judge that went to these core issues. And I'm just kind of curious why that didn't happen during the course of the trial. Were you the trial counsel? I was not, your honor. But Dr. Pennington, Dr. Porter, Dr. Hockmeyer all testified that this was a reasonable conclusion to draw. And so there was no need to put on the experts. And none of those witnesses have been discussed this morning by the government. They weren't discussed in their opposition brief. And that's the core problem that they're not dealing with. And the reason this court needs to no vote review of that constitutional fact is because where there are two sides, the jury doesn't get to pick which expert or which witness it likes best. That's the teaching of McAnulty, where there's a dispute, then the wire fraud statute doesn't reach it. The same is true of good faith. The court needs to make a new assessment of that because there was no jury instruction on that. There's no jury finding on that. The court can't defer to that jury finding because we didn't get the instruction. And there's a core issue of good faith because the whole scheme makes no sense. You read the press release on its face and it says doctors should evaluate this evidence. We're going to give you more details at these upcoming medical conferences. This is the most nonsensical scheme to defraud doctors that's ever been alleged. And that needed to be evaluated. Thank you. May I have two minutes to just give some sites on the cross appeal? Okay, yes, you can have a minute and a half for that. Thank you. The court did make a finding on intended loss. Please look at SER 3749. There she accepts two enhancements from paragraphs 32 and 35, and strikes the rest, including paragraph 30, which addressed intended loss. And she knew she was rejecting intended loss. And the court can see this at SER 3701 through 04, where I explained that paragraph 16 addressed intended loss, objects it to the rationale in the sentences going to intended loss, and she noted and agreed with those objections. The government also cannot show clear error in that finding, in that striking of intended loss, because the government's theory below was that the drug was worthless, and so all projected sales were intended losses. And the government and the trial court clearly rejected that at SER 3675 to 76, saying that there were some positive extrapolations that could be made, some positives in the trial, and these were good reasons why doctors independently prescribed the drug. And finally, on the vulnerable victim, section 3A1.1, application note two, says that vulnerable victim means a person who is a victim. And in the two sentences that the government is referring to in her finding, the second sentence says, we don't have a victim here. That's what the government tried to show below, a victim. And she said, we don't have a victim here. And without a victim, you cannot have a vulnerable victim. And that is precisely what the application note says. Every case, including all the new ones in the reply brief, all talk about particular identifiable victims whose vulnerability can be assessed. Here, the court rejected the idea that the patients were victims. She said there were positives in the data, that there was evidence that the drug was prescribed in good faith and helped some patients. And therefore, you could not categorically say that all of the patients were victims. And so that rejects that theory. Thank you. Thank you for your arguments. Case is now submitted. We have completed our docket for today, and we're now in recess. Thank you.
judges: Nelson, Tashima, Murguia